# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEVEN S. BOCCHINO,               :         No. 3:14cv662
                    **Appellant**  :
                                   :         **(Judge Munley)**
          **v.**                   :
                                   :
UNITED STATES SECURITIES AND       :
EXCHANGE COMMISSION,               :
                    **Appellee**   :
:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Before the court for disposition is Appellant Steven S. Bocchino's

appeal of Bankruptcy Judge John J. Thomas's decision issued on

December 23, 2013.  The matter has been fully briefed and is ripe for

disposition.  For the reasons stated below, the appeal will be **DENIED**.

## Background

In 1996, Appellant Bocchino worked as a stockbroker and general

securities representative at M.A. Gillespie.[1]   His superior at the time,

Americo "Ricky" Gallo, alerted Bocchino to a private subscription offering

for a company known as Traderz Associates Holding, Inc. (hereinafter

"Traderz") that was potentially going public.  Gallo told Bocchino that he

would receive a commission on any investments his clients made in

---

[1]Appellant does not contest the bankruptcy court's findings of fact, and therefore citations to that court's decision have been omitted.

Traderz.  Without performing any due diligence of his own, Bocchino immediately began contacting his clients and selling them a private investment in Traderz with the pitch that much money could be made in the investment.

To secure these sales, and the concomitant commissions, Bocchino made various statements, including that a model named Niki Taylor was involved with the company, with whom the public could communicate online about fashion tips and her line of clothing.  (Doc. 3, Bankruptcy Court Trial Transcript at 28-29.)  He asserts that at the time he believed none of the statements were untrue.  Bocchino, however, had made no investigation of whether Traderz was incorporated, had bank accounts, or even an office.  He relied solely on Gallo's minimal representations. Bocchino's clients paid over $30,000 for Traderz subscriptions, and Bocchino received over $40,000 directly from Traderz in commissions and bonuses.

Subsequently, Bocchino received a "tip" from an associate, Daniel Coyle, regarding investments in a second company, Fargo Holdings, Inc. (hereinafter "Fargo").  Bocchino testified that he received some "documentation" from Coyle, and that he met a day trader from Fargo,

2

though his testimony conflicted as to whether he met that trader before or after he started soliciting his clients.  Despite the fact that Bocchino, again, had not conducted any of his own due diligence, he began selling the Fargo stock, telling his clients that they would make money if they invested in the company.  Relying on his statements, Bocchino's clients purchased over $55,000 worth of Fargo stock, for which Bocchino received $14,000 in cash commissions.

Sometime thereafter, Bocchino received information that Fargo might not be a legitimate enterprise, and he then began to investigate the company.  Ultimately, the principals of both Traderz and Fargo were subject to criminal judgments for illegal activities related to their respective companies.  The Traderz subscriptions became worthless, and Fargo disappeared.

In the early 2000s, the Securities and Exchange Commission (hereinafter "SEC") brought civil actions in federal district court against Bocchino and others related to Traderz and Fargo.  See SEC v. Goldman Lender & Co. Holdings, et al., 98-CV-7525 (JGL) (S.D.N.Y.) (regarding Traderz); SEC v. Nnebe, et al., 01-CV-5247 (KMW) (S.D.N.Y.) (regarding Fargo).  As a result of default judgments in both actions, Bocchino was

3

ordered to pay: (1) $84,959.70 in the Traderz action, including $35,090 in

disgorgement, $14,779.70 in prejudgment interest, and a $35,090 civil

penalty to the SEC; and (2) $94,007.85 in the Fargo matter, including

$14,800 in disgorgement, $4,207.85 in interest, and a $75,000 civil

penalty to the SEC.

On March 2, 2009, Bocchino filed a petition for bankruptcy under

Chapter 13 of the U.S. Bankruptcy Code (Title 11 U.S.C.).  The SEC filed

Adversary Proceeding 5:09-ap-00267-JJT under 11 U.S.C. § 523(a)(2)(A)

on July 17, 2009, objecting to the discharge of the debt owed to the SEC

pursuant to the two district court judgments.  The parties disputed whether

Bocchino obtained the funds owed to the SEC by fraud.  If he did, the

debts could not be discharged.  A trial was held on that issue on January

23, 2013.  Bocchino and one other person testified, and exhibits, including

multiple depositions, were entered into the record.

On December 23, 2013, the bankruptcy court issued an Opinion and

Order ruling in favor of the SEC.  (Doc. 2-6.)  The court found that though

Bocchino did not knowingly make any false statements in selling the

Traderz and Fargo investments, his conduct was grossly reckless and he

was indifferent to the truth of his statements.  Therefore, Bocchino

4

acquired the funds by fraud, and, the bankruptcy court held,

§ 523(a)(2)(A) applied, rendering the debt non-dischargeable.[2]  On

January 6, 2014, appellant filed a motion to reconsider, which the

bankruptcy court denied on February 19, 2014.  Appellant filed notice of

appeal to this court on March 5, 2014.

**Jurisdiction**

This court has jurisdiction over the instant bankruptcy appeal

pursuant to 28 U.S.C. § 158(a)(1), which provides that the district courts of

the United States have jurisdiction to hear appeals from final judgments,

orders, and decrees of the bankruptcy courts.

**Standard of Review**

A district court reviews the bankruptcy court's decisions of law *de

novo*.  In re O'Brien Envtl. Energy, Inc., 188 F.3d 116, 122 (3d Cir. 1999).

The bankruptcy court's findings of fact will only be set aside if clearly

erroneous.  FED. R. BANKR. P. 8013 ("Findings of fact, whether based on

oral or documentary evidence, shall not be set aside unless clearly

erroneous, and due regard shall be given to the opportunity of the

---

[2]  The bankruptcy court held that the disgorgement and interest portions of the judgments were non-dischargeable under § 523(a)(2)(A), but that the civil penalties are dischargeable under the superdischarge provisions of § 1328(a).

bankruptcy court to judge the credibility of the witnesses."); In re O'Brien, 188 F.3d at 122.

**Discussion**

Appellant asserts two issues on appeal.  First, he argues that the bankruptcy court applied an incorrect standard in basing a finding of fraud (and hence non-dischargeability) on appellant's extreme and reckless indifference to the truth of his statements, rather than requiring actual knowledge of their falsity and intent to deceive.  Second, appellant contends that the bankruptcy court erred in finding that his actions were the proximate cause of his clients' losses.  The court will address these issues in turn.

**A.    11 U.S.C. § 523 – Exceptions to Discharge**

Before the bankruptcy court, Appellee, the SEC, successfully invoked § 523(a)(2)(A) to prevent the discharge of debts for money it claims was obtained by appellant through fraud.  Section 523(a)(2)(A) renders debts for money obtained by "false pretenses, a false representation, or actual fraud" non-dischargeable under the Bankruptcy Act.  This rule is in line with the policy goals of U.S. bankruptcy law, which exists "to provide a procedure by which certain insolvent debtors can

6

reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life . . . ." Grogan v. Garner, 498 U.S. 279, 286 (1991); see also Schwab v. Reilly, 560 U.S. 770, 791 (2010).  The § 523 exceptions are designed to limit that opportunity for a fresh start to the "honest but unfortunate debtor," for whom bankruptcy is intended.  Grogan, 498 U.S. at 286-87; In re Bogan, 302 B.R. 524, 529 (Bankr. W.D. Pa. 2003).

The creditor "has the burden of proving beyond a preponderance of the evidence" that his claim comes within an exception to discharge.  In re Bryen, 449 F. App'x 165, 167 (3d Cir. 2011).  "Exceptions to discharge are narrowly construed to further the Bankruptcy Code's 'fresh start' policy[.]" In re White, 128 F. App'x 994, 998 (4th Cir. 2005) (citing Grogan at 286). The exceptions, however, are to be enforced where appropriate "to make certain that those who seek shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs."  Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997).  By ensuring that debts for money obtained through bad acts cannot be wiped clean in bankruptcy, § 523(a)(2) prevents wrongdoers from pressing the law into service as an accessory after the fact in retaining their ill-gotten gains.

**B. Recklessness is sufficient for a finding of fraud.**

As a preliminary matter, appellant does not contest the bankruptcy court's factual findings.  Therefore, we accept the facts as true.  The bankruptcy court found that appellant's failure to perform any due diligence before selling the investments constituted extreme and reckless indifference to his duty as a fiduciary to "conduct independent investigation into the quality of the product he was selling."  (Doc. 2-6, Opinion of the Bankruptcy Court (hereinafter "Op.") at 7).

The appellant instead argues that his misrepresentations, which were the product of his gross and egregious recklessness, do not satisfy the required elements for a claim under § 523(a)(2)(A).  Though appellant acknowledges at the outset that "an intent to deceive may be found upon a finding of recklessness," he, somewhat confusingly, argues that "actual wrongful intent to deceive" is also required.  Both statements, however, cannot be true; we will therefore review the bankruptcy court's decisions of law *de novo*.

As previously stated, § 523(a)(2)(A) renders debts for money obtained by "false pretenses, a false representation, or actual fraud" non-dischargeable under the Bankruptcy Code.  The court can find, and the parties have identified, no precedent binding on this court on the question

of whether § 523(a)(2)(A) requires a showing of actual knowledge of falsity and intent to deceive.  The Third Circuit Court of Appeals has not yet addressed this issue, although other district courts within the Third Circuit have, and they are persuasive.  Still, we approach this as a question of first impression.

The bankruptcy court found guidance in the Supreme Court's recent opinion in Bullock v. BankChampaign, N.A., 133 S. Ct. 1754 (2013).  While, as the bankruptcy court acknowledges, Bullock involved § 523(a)(4) and not § 523(a)(2)(A), we agree that the Court's reasoning is instructive.  Section 523(a)(4) provides that an individual cannot obtain a bankruptcy discharge from a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  In an opinion delivered by Justice Breyer, a unanimous Court held that the term "defalcation" in § 523(a)(4) "includes a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase," including fraud.  Id.  The Court defined that state of mind as "one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior."  Id.

Here, the bankruptcy court looked to Justice Breyer's examination of

"intentional" conduct where "actual knowledge of wrongdoing is lacking." Id. at 1759-60.  "We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent."  Id.  In other words, the Supreme Court held that the culpable state of mind required to prove fraud and defalcation by a fiduciary is satisfied by a finding of recklessness, at least for the purposes of one exception to bankruptcy dischargeability.  We find this persuasive in examining the identical term – fraud – in a similar exception to dischargeability.

We next look to the Third Circuit Court of Appeals.  Again, no case is squarely on point, but we find Insurance Company of North America v. Cohn (In re Cohn), 54 F.3d 1108 (3d Cir. 1995) to be instructive.  In Cohn, the court examined the same question we have before us, but with respect to § 523(a)(2)(B), which prevents the discharge of funds obtained by use of certain materially false written statements.  This provision contains an express "intent to deceive" requirement in the statutory language, which its companion provision, § 523(a)(2)(A), does not.  The Cohn court held that a "creditor can establish intent to deceive by proving reckless indifference to, or reckless disregard of, the accuracy of the information in the financial

10

statement of the debtor when the totality of the circumstances supports

such an inference." <u>Cohn</u>, 54 F.3d at 1119.  This standard of proof is

utilized because of the evidentiary challenges inherent in proving the

intent element:

> We acknowledge that because a debtor will rarely, if ever,
> admit that deception was his purpose, this fourth element
> of § 523(a)(2)(B) is extremely difficult for a creditor to
> prove by direct evidence. Thus, we join with other courts,
> including the Courts of Appeals for the Sixth, Tenth, and
> Eleventh Circuits, in holding that the intent to deceive can
> be inferred from the totality of the circumstances,
> including the debtor's reckless disregard for the truth.

<u>Id.</u>  It is worth noting that the Court of Appeals came to this conclusion

long before <u>Bullock</u>, though the reasoning is similar.

The court finds this reasoning to be as applicable to § 523(a)(2)(A)

as to § 523(a)(2)(B).  Other courts in this Circuit have already accepted

this reasoning.  <u>See</u> <u>In re Purington</u>, No. 12-4135, 2013 WL 3442893, at

*2-3 (D.N.J. July 9, 2013); <u>In re Pandolfelli</u>, Nos. 11-579, 11-5231, 11-

7031, 2012 WL 503668, at *7 (D.N.J. 2012); <u>Starr v. Reynolds</u>, 193 B.R.

195, 200 (D.N.J. 1996).  The standard that has developed for establishing

a claim under § 523(a)(2)(A), is that a party must show each of the

following elements:

(1) that the debtor obtained money, property or services

11

> through a material misrepresentation; (2) that the debtor,
> at the time of the transaction, had knowledge of the falsity
> of the misrepresentation or reckless disregard or gross
> recklessness as to its truth; (3) that the debtor made the
> misrepresentation with intent to deceive; (4) that the
> plaintiff reasonably relied on the representation; and (5)
> that the plaintiff suffered loss, which was proximately
> caused by the debtor's conduct.

In re Purington, 2013 WL 3442893 at *2-3.  The Purington court explains

that the third prong of the test can be satisfied by reckless disregard for

the truth.  Id.

Appellant directs the court's attention to In re White, 128 F. App'x

994 (4th Cir. 2005).  The Court of Appeals for the Fourth Circuit held that

a fraudulent misrepresentation is proven if the debtor's representation was

either "known to be false or recklessly made without knowing whether it

was true or false."  Id. at 9-10.  Likewise, the White court found that "[a]

showing of reckless indifference to the truth is sufficient to demonstrate

the requisite intent to deceive."  Id. at 11.  Echoing the Third Circuit's

reasoning in In re Cohn, the court explained that evidence of recklessness

was sufficient to prove knowledge and intent because "a debtor will rarely,

if ever, admit to acting with an intent to deceive, [so] intent may be inferred

from the totality of the circumstances."  Id.

In re White is especially instructive in this case because the White

12

court reviewed whether a debt was non-dischargeable under § 523(a)(2)(A).  As in the case before us, the bankruptcy court in White made a finding that the debtor had made representations with reckless disregard for their truth, and held that that was sufficient to prove the intent requirement.   128 F. App'x at 1001.  The district court reversed, based on what the Court of Appeals called an improper "*de novo* review of the [factual] record."  Id.  The Court of Appeals, finding no clear error in the bankruptcy court's findings of fact, then reversed the district court and reinstated the bankruptcy court's finding that the debt was not dischargeable.  Id. at 1002-03.  The Fourth Circuit did not disturb the bankruptcy court's legal conclusion that a debtor's recklessness was a sufficient foundation upon which to conclude there was an intent to deceive.

Appellant also relies on two bankruptcy court cases that he argues demonstrate a hard and fast requirement for a court to find actual intent to deceive, as opposed to mere recklessness.  Neither of these cases is relevant to the matter at bar.  In In re Styer, Case 08-02096, Doc. 125 (Bankr. E.D. Pa. 2013), the debtor was found to have credibly testified that she had an affirmative belief in the value of the wrap mortgage investment

13

she sold, demonstrating detailed knowledge about the product.  Id. at 20-22.  Further, the debtor in Styer had invested in the product herself, and she and her family lost a substantial amount of money.  Id. at 22.  Most importantly, the creditors in that case did not argue, and the bankruptcy court never found, that the debtor's actions were reckless.  If her misrepresentations had been reckless, then the court might have considered whether that finding satisfied the intent element of § 523(a)(2)(A).  For these reasons, Styer is not helpful.

Appellant next points to In re Peak, Case 12-00126-8-ATS, Doc. 47 (Bankr. E.D.N.C. 2013).  This case is similarly irrelevant.  As in Styer, the Peak court never discussed recklessness, and merely found that the plaintiffs had not met their burden to prove knowledge or intent.  Id. at 7. The court did not consider whether knowledge and intent can be proven by recklessness.

Further, the debtor in that case was a homebuilder who essentially had gotten in over her head with respect to an investment offering related to her company that she did not fully understand.  Id. at 5-6.  She had no experience or expertise in financial offerings, and her actions did not approach the "gross recklessness" found in Mr. Bocchino's dealings.

14

Therefore, <u>Peak</u> is distinguishable on both its facts and legal reasoning.

The appellant places great emphasis on a statement in the bankruptcy court's opinion, "Bocchino did not knowingly make any false statements."  (Op. at 2).  But, as appellant himself acknowledges, a finding of intent to deceive can be based on recklessness.  That the bankruptcy court did not find actual knowledge and direct proof of intent to deceive does not, as appellant urges, end the inquiry.  For the reasons articulated above, it merely refocuses the analysis on appellant's gross and egregiously reckless disregard for the truth.

The court is persuaded by the reasoning articulated by the Supreme Court in <u>Bullock</u>, the Third Circuit Court of Appeals in <u>In re Cohn</u>, and the Fourth Circuit in <u>In re White</u>.  To give full effect to the policy goals underlying the Bankruptcy Code and the exceptions to discharge contained therein, we hold that a finding that a debtor made a material misrepresentation with reckless disregard for the truth is sufficient to prove that the misrepresentation was made knowingly and with intent to deceive for the purposes of § 523(a)(2)(A).  The bankruptcy court did not err in applying this standard.

### C. Appellant's Fraud was a Proximate Cause of his Clients' Losses

15

The fifth element that a creditor must prove to invoke the exception to dischargeability in § 523(a)(2)(A) is "that the plaintiff suffered loss, which was proximately caused by the debtor's conduct." In re Purington, 2013 WL 3442893 at *2-3.  Appellant argues that the losses suffered by his clients as a result of the failure of their investments were not proximately caused by his fraudulent misrepresentations.  Among appellant's reasons for this assertion are: (1) the losses were caused by the "defalcation of the principals of both Traderz and Fargo, both of whom received criminal sentences"[3]; (2) Bocchino had direct access to the principal of Traderz; and (3) after selling the investments without performing any prior research, Bocchino eventually did obtain some information on both companies.  The court disagrees.

"Proximate cause" is a legal term of art, and the proximate cause requirement of § 523(a)(2)(A) has been likened to the term's use in the realm of tort law.  See Archer v. Warner, 538 U.S. 314, 325-26 (2003) (Thomas, J., dissenting); In re Britton, 950 F.2d 602, 604 (9th Cir. 1991); In re Karpo, 2011 Bankr. LEXIS 2881, 25-26 (Bankr. D.N.J. July 22,

---

[3]  We assume for the sake of this analysis that this statement is factually correct.  Appellant has not provided the court with any of the trial exhibits to which he refers in his briefs.  Nonetheless, as the analysis shows, the accuracy of this statement is not relevant to our conclusions.

16

2011).

Writing in the context of § 523(a)(2), Justice Thomas wrote in <u>Archer</u>

<u>v. Warner</u> that the Supreme Court:

> has been less than clear with respect to the requirements
> for establishing proximate cause.  In the past, the Court
> has applied the term "'proximate cause' to label
> generically the judicial tools used to limit a person's
> responsibility for the consequences of that person's own
> acts."  <u>Holmes v. Securities Investor Protection</u>
> <u>Corporation</u>, 503 U.S. 258, 268 (1992).  The Court has
> explained that, "at bottom, the notion of proximate cause
> reflects 'ideas of what justice demands, or of what is
> administratively possible and convenient.'"  <u>Id.</u>  (quoting
> W. Keeton, D. Dobbs, R. Keeton, & D. Owen, <u>Prosser</u>
> <u>and Keeton on Law of Torts</u> § 41, p. 264 (5th ed. 1984));
> see also <u>Palsgraf v. Long Island R. R. Co.</u>, 248 N. Y. 339,
> 352 (1928) (Andrews, J., <u>dissenting</u>) ("What we do mean
> by the word 'proximate' is, that because of convenience,
> of public policy, of a rough sense of justice, the law
> arbitrarily declines to trace a series of events beyond a
> certain point").  While the concept of proximate cause is
> somewhat amorphous, <u>see</u> Keeton 279, the common law
> is clear that certain intervening events -- otherwise called
> "superseding causes" -- are sufficient to sever the causal
> nexus and cut off all liability.  <u>See</u> <u>Exxon Co., U.S.A. v.</u>
> <u>Sofec, Inc.</u>, 517 U.S. 830, 837 (1996) ("The doctrine of
> superseding cause is . . . applied where the defendant's
> negligence in fact substantially contributed to the
> plaintiff's injury, but the injury was actually brought about
> by a later cause of independent origin that was not
> foreseeable" (quoting 1 T. Schoenbaum, <u>Admiralty and</u>
> <u>Maritime Law</u> § 5-3, pp. 165-166 (2d ed. 1994))); 57A
> Am. Jur. 2d <u>Negligence</u> § 790 (1989) ("The intervention,
> between the negligence of the defendant and the
> occurrence of an injury to the plaintiff, of a new,

> independent, and efficient cause, or of a superseding cause, of the injury renders the negligence of the defendant a remote cause of the injury, and he cannot be held liable, notwithstanding the existence of some connection between his negligence and the injury").

538 U.S. at 325-26.

It has been said that proximate cause depends upon whether the conduct at issue was significant and important enough to hold the defendant legally responsible, "[b]ut both significance and importance turn upon conclusions in terms of legal policy, so that they depend on whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred." In re Britton, 950 F.2d at 604-05 (citing W. Page Keeton et al., Prosser and Keeton on The Law of Torts § 42 at 273 (5th ed. 1984)).

Here, Bocchino sold investments to his clients, who relied upon his representations that those investments would produce profit. Bocchino had done no research into the companies whose investments he sold, and had no basis upon which to make the representations he did. His clients relied on his statements, along with his expertise and position as fiduciary, in buying the investments. The investments then failed, and the clients suffered losses. These facts are not disputed on appeal.

Appellant argues that the crimes committed by the principals of Traderz and Fargo were the proximate cause of his clients' losses, and therefore his own reckless misrepresentations could not have been the proximate cause of those losses. This argument ignores the well-established legal rule that there can be more than one proximate cause of an event. See, e.g., Staub v. Proctor Hosp., 131 S. Ct. 1186, 1192 (U.S. 2011) ("[I]t is common for injuries to have multiple proximate causes.").

What appellant may be asserting is that the crimes of Traderz's and Fargo's principals were superseding causes that severed the causal relationship between his recklessness and his clients' losses. This assertion is misplaced, because the bad acts of the companies' principals were a reasonably foreseeable possibility when appellant decided to sell the investments without due diligence. "The doctrine of superseding cause is . . . applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable." Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830, 837 (1996). It is entirely foreseeable that a company's executives may act in bad faith, causing losses to investors. Indeed, the diligence appellant should have

performed, had he not recklessly failed to do so, would have included a search for indications of the potential for such bad faith acts on the part of the offering company.

Moreover, while the crimes that the companies' principals committed certainly constitute a proximate cause of the losses incurred by their investors, that does nothing to change the fact that it was appellant, through his reckless misrepresentations, who caused his clients to be among that unfortunate group.  In this respect, appellant's reliance on In re Moon, 1997 WL 3425685 (Bankr. E.D. Va. 1997) is misplaced.  In that case the court concluded that the evidence did not support a finding of proximate causation.  The court said that even without the misrepresentations of the debtor, the creditor "would have received the same poorly built house."  Id. at 17.  In the case at bar, however, nothing before the court indicates that Bocchino's clients, though they may have purchased some investment, would have purchased the offerings from Traderz and Fargo even absent Bocchino's reckless misrepresentations. Therefore, those misrepresentations, that is to say, Bocchino's fraud, caused his clients' losses.

Appellant next argues that because he had direct access to the

principal of Traderz, which, he asserts, means he "was able to establish, at very least [sic], to the best of his knowledge, that the principal had the 'wherewithal, financially and experience-wise, to accomplish the goals of the organization.'" This fact is irrelevant to the proximate cause analysis. Appellant is merely attempting to re-litigate the bankruptcy court's finding that appellant's conduct constituted recklessness.  This conclusion is a factual finding, and we find no clear error in that finding.

Appellant's final argument is the most confounding.  Appellant asserts that proximate cause cannot be found because after selling the investments without performing any prior research, appellant eventually did obtain some information on both companies.  He cites no authority for this proposition, that somehow *post hoc* due diligence absolves the recklessness with which the initial sale was made.  He argues that because this diligence was performed sometime before the criminal acts of the companies' principals led to the failure of the investments, that means that Bocchino had, at that time, "a sufficient basis to attempt to sell interests in the enterprise."  What this logically-gymnastic argument elides is the fact that since he had already sold the investments by that time, this new-found knowledge as to the investment products did absolutely

nothing to remove his clients from harm's way.  As we said above,

Bocchino's recklessness caused his clients to purchase the investments;

that he became less reckless after that sale did not change the fact that

his clients still owned the investments.  So it cannot possibly have

retroactively undone the causal nexus.

Appellant highlights Bocchino's own testimony that "[a]t least with

regard to Traderz, Bocchino advocated that funds be returned to at least

one investor."  (See Bankruptcy Court Transcript, Doc. 3, at 66).  Self-

serving, uncorroborated testimony notwithstanding, this statement only

trains a spotlight on all the clients Bocchino did not seek to use his

belated knowledge to help.  Regardless of any research he conducted

after the fact, it was still Bocchino's reckless misrepresentations that

proximately caused his clients to purchase the investments, and therefore

to suffer losses.

**Conclusion**

For the reasons stated above, the court holds that the bankruptcy

court correctly found that the debts for funds appellant gained by fraud,

enumerated in the underlying civil judgments, are not dischargeable under

§ 523(a)(2)(A).  The bankruptcy court's decision will therefore be

**AFFIRMED**, and appellant's appeal will be **DENIED**.   An appropriate

order follows.


**Date:**<u>9/26/14</u>                    <u>**s/ James M. Munley**</u>
                         **JUDGE JAMES M. MUNLEY**
                         **UNITED STATES DISTRICT COURT**